JAMES H. ADAMSON, Appellant, Respondent, *v.* PERCY ADAMSON, Respondent, and SUPERIOR SEATING COMPANY, INC., Intervenor, Appellant.

THOMAS ADAMSON, Appellant, Respondent, *v.* SUPERIOR SEATING COMPANY, INC., and Others, Respondents, Impleaded with JAMES H. ADAMSON, Appellant, Respondent.

(Consolidated Actions.)

First Department, January 15, 1937.

*Neilson Olcott* of counsel [*John Godfrey Saxe, Lyman A. Spalding* and *William J. O'Shea, Jr.,* with him on the brief; *Spalding & McCabe,* attorneys], for James H. Adamson.

*Robert P. Levis* of counsel, for Superior Seating Company, Inc.

*Harold H. Corbin* of counsel [*Francis B. Delehanty* with him on the brief; *George Thoms,* attorney], for Percy Adamson.

UNTERMYER, J. These are consolidated actions. The first action is by the plaintiff James H. Adamson for the dissolution of a partnership and for an accounting. The second action is by Thomas Adamson, alleged sole stockholder of the defendant Superior Seating Company, Inc., asserting, under assignment from James H. Adamson, in its behalf, the rights of James in the alleged partnership. The second action was not fully tried, leave having been obtained to reopen the proceedings if it were determined that there was a partnership.

Issues raised by one of the defenses in the amended answer of the defendant Percy Adamson in the first action, to the effect that the plaintiff James H. Adamson was not the real party in interest, were first heard and the defense was dismissed on the ground that he had not transferred his rights. The principal issue was then tried resulting in the dismissal of the complaint of James H. Adamson upon a determination that a partnership did not exist. Only that issue is now here.

In the fall of 1925 James H. Adamson and his brother, Percy Adamson, entered into an arrangement out of which was established the firm of Adamson Bros. Company. Whether that arrangement constituted them partners in their relation to one another, or whether the business conducted under the firm name was solely owned by Percy is the fundamental question to be determined here. James asserts that he and Percy became equal partners under an agreement whereby he invested $2,000 in the firm, loaned his credit and assisted in the management of the firm affairs. Percy concedes that ostensibly James became a partner in the firm but contends that he participated in its affairs only from motives of brotherly solicitude to accomplish Percy's personal and economic rehabilitation. Since no writing was executed setting forth the agreement of the parties, it must be determined from the testimony, from the conduct of the parties and especially from the documentary evidence. (*Martin* v. *Peyton*, 246 N. Y. 213, 217.) In discussing these it will be impossible, on account of the complexity of the facts, to do more than indicate the reasons which convince us of the existence of a partnership in which James and Percy were equal partners.

In 1925 James was a man of substantial wealth engaged in a prosperous business in public seating under the trade name of Superior Seating Company. Percy had managed Adamson Brothers, Inc., a company which had dealt in cotton yarns, in which Thomas and Seth, two other brothers, were also interested. That business had languished and was forced to cease operations in 1924. In consequence, in September, 1925, the time of the transaction in question, Percy was in desperate financial plight and moreover was discouraged, drinking heavily and addicted to bad company. He pleaded with James for help as did other members of the family. Eventually James loaned Percy a small sum of money for pressing personal obligations and arranged that Percy be established in his office where he could be closely supervised. There is a sharp conflict in the testimony concerning the arrangement then entered into between Percy and James. Percy testifies that James offered to give him desk room, lend him about $2,000, the use of his office

force and above all that he would lend his credit, but " he told me that it was up to me to pull myself together," " cut out this drinking and this bunch that you are hanging around with." Thus, according to Percy, he was to be the sole owner of the business and James was to be limited to the repayment of the $2,000 or any further sums advanced by him.

James, on the contrary, testifies that in the fall of 1925 Percy said " he would like me to consider going into a partnership business with him in the yarn business, stating that he believed that he had a wonderful opportunity if he could get the proper kind of support. * * * He said ' Two or three thousand dollars should be sufficient to get properly started and under way; * * * that he could earn sufficient commissions from these concerns to practically pay the office overhead of the yarn business. He said ' That is not the most important part of the business that I would like to work on.' He said that he had ideas of developing special yarns; * * * that if I would give him my support and my credit and time and help him with this business, there was no reason why we could not both be rich from the returns of this special yarn business. * * * He * * * suggested that we would divide the profits fifty-fifty and whatever moneys he would receive in any shape, manner or form, he agreed to deposit into the company that was to be formed. * * * I said that I would go along with him provided he would acquiesce to my controlling all of the funds and that he would agree to let me see all important contracts before they were made, as he realized that I had something to lose and at that time he had nothing to lose and I wanted him to make sure that I would get full protection against creditors. * * * He said that that was entirely satisfactory * * * and it was on that basis that we started the Adamson Brothers Company."

Concededly, a bank account was opened in the name of Adamson Brothers Company with a deposit of $2,000 by check of the Superior Seating Company, upon the understanding that James should control all the funds until Percy had demonstrated his ability to " make good." It was also agreed that Percy should have a salary or drawing account for personal expenses but that all earnings from the business should be deposited in the firm account. A certificate was signed and acknowledged by James and Percy to the effect that they were trading under an assumed name, in compliance with section 440 of the Penal Law, reading as follows:

" James Harold Adamson — Percy Adamson do hereby certify that they are conducting or transacting business under the name of Adamson Bros. Company at 105 West 40th St. in the City of New

York, State aforesaid, and that the true or real name of the persons conducting or transacting the same, as follows:

| Name | P. O. Address |
|---|---|
| James Harold Adamson | 105 West 40th St. |
| Percy Adamson | 105 West 40th St." |

For seven years thereafter partnership income tax returns, signed by Percy, were filed with the Federal and State governments, containing the names of Percy and James as the partners and the date of the formation of the partnership as September, 1925. Because the returns for 1926 to 1929, inclusive, disclose Percy's interest in the percentage of net income as " 100% " he contends that they reveal no partnership relation, but since Percy's salary absorbed the entire earnings for those years, the allocation to him of the total income in the partnership is not necessarily inconsistent with the claim of James. Moreover, the Federal and State partnership income tax returns for the year 1930 show a fifty per cent interest in the partnership allocated to James and a like interest to Percy, making the sum to be reported on the individual return of each partner $21,568.68. The 1931 returns show Percy with a seventy-five per cent interest and James with a twenty-five per cent interest, the sum of $31,507.82 to be reported individually by Percy and the sum of $9,523.29 to be reported by James. The returns for 1932 state the percentage of interest of each partner to be " as agreed," with James' distributive share as $10,015.83 and Percy's as $1,020.34.

The record contains other documents and correspondence which declare the business to be a partnership not ostensible only, but real. As the enterprise developed through the years, its main business became the sale of special yarns, manufactured for the firm in accordance with Percy's ideas, such as " Celanol," a combination of celanese and cotton, " Celawol," a combination of celanese and wool, " Celaton," a combination of celanese and cotton twisted together, and " Rayonol " and " Rayawol," made of rayon waste in combination with cotton or wool. In February, 1927, Percy wrote to James while the latter was in London negotiating with British interests for the sale of the firm's products, saying: " This will mean a big thing *for us* if they start to manufacture in England on any basis, and if it is possible for you to be at the conference with Mr. Pilling, Mr. Pickering and Dr. Dreyfus I would by all means do it. * * * Everything here is going along very nicely. I'm not going to bother you with details at this time." Contracts also were executed which recite that they are made with Adamson Bros. Company, " a partnership composed of J. H. Adamson and Percy Adamson." In November, 1927, the firm received a credit of $2,075.69, representing a pre-

vious overcharge, and this was credited equally to the accounts of James and Percy on the firm's books. In July, 1930, Percy applied for a patent on "Lastex," an elastic yarn invented by him. The application was filed by an attorney to whom Percy then said "that we registered as a partnership." The patent attorney's bills were paid by the firm and charged as an expense of the business. Application was made to the Patent Office by Adamson Bros. Company, " a partnership composed of James H. Adamson and Percy Adamson," to register the word " Lastex " as a trade name accompanied by a declaration under oath that the members of the firm were James and Percy Adamson.

On May 5, 1931, Percy verified a statement, made for the purpose of correcting the trade-mark application, reading in part: " Percy Adamson, being duly sworn, deposes and says that *he is a member of the firm*, the applicant named in the Petition and Statement forming part of application for trade mark registration;  *  *  * that he believes *said firm* is the owner of the trade mark sought to be registered." On July 10, 1931, the firm assigned the trade-mark " Lastex " to the United States Rubber Company by an assignment which recites: " Whereas, Adamson Bros. Company, *a partnership consisting of Percy Adamson and James H. Adamson,*  *  *  * are the owners of a trade mark LASTEX for yarns," and is subscribed as follows: " In witness whereof, the said partners have hereunto set their hands and seals this 10th day of July, 1931.

" ADAMSON BROS. COMPANY

" Percy Adamson

" James H. Adamson."

This assignment also bears the acknowledgment of both Percy and James to the effect " that they are partners of Adamson Bros. Company."

During 1930 Seth Adamson received $2,000 from the firm's account and the amount so paid was charged one-half against James' and one-half against Percy's interest in the firm. During 1931 Seth received an additional $3,750, which again was charged in the same way. There are also numerous instances of simultaneous and equal drawings by James and Percy which, it seems to us, cannot be explained, except upon the theory of partnership. On May 26, 1928, occurred the first instance of a substantial withdrawal by Percy in excess of salary by a check to his order for $375. On the same day a check for the same amount was drawn to James' order. On August 17, 1928, a check for $500 was drawn to Percy's order and one for a like amount to James. On November 9, 1928, a check for $400 was drawn to Percy's order and on November 13, 1928, a check for the same amount to James. On June 16,

1930, each party drew $500. On October 31, 1930, a check for $200 was drawn to Percy's order and on November 3, 1930, a check for a like sum was drawn to the order of James. Such entries, it has been said, " are virtually conclusive to establish that the two were partners." (*Matter of Rosenberg*, 251 N. Y. 115, 124.)

By 1931 the affairs of the partnership appear to have flourished, and James on the contrary had encountered serious financial reverses. In February of that year one Peterson, an accountant, was delegated by the American Seating Company, Inc., James' largest creditor, to take control of the books of the Superior Seating Company. In connection therewith, Peterson examined the books of Adamson Bros. Company and made the following entry therein: " By agreement of the partners of Adamson Bros. Company, J. H. Adamson and Percy Adamson are to be charged or credited with the profits or losses on a 50-50 basis and both partners are equally responsible for all liabilities incurred." Percy's explanation of this is that in order to alleviate James' financial difficulties, he had allowed Peterson to set up the books in such a way as to indicate to the American Seating Company that James had an interest in Adamson Bros. Company. Percy testified that the entry was " not according to the agreement I had with my brother " but he admitted that " I have not claimed that he [*i. e.*, Peterson] made any false entry." Percy's contention that this entry was merely to serve a temporary purpose in assisting James is, however, refuted by a letter written contemporaneously by Percy's witness Green-berg, a certified accountant, which demonstrates that Percy at that time could have entertained no doubt of James' status as a partner. Moreover, the entry made by Peterson was followed in the Federal and State partnership income tax returns which were filed soon thereafter as well as in a financial statement which showed James and Percy to be equal partners, executed by Percy for the purpose of obtaining a bank loan; and thereafter remained unchanged upon the partnership books.

In January, 1932, James wrote Percy demanding that their arrangement be put upon a more specific basis, saying " our agreement was that you were to draw $150 weekly and that I was to draw equally with you beyond that amount." To this Percy did not reply. James' attorney then wrote several letters to Percy first suggesting an amicable settlement and later threatening suit. Percy denied having received these. However, in May, 1932, he called at the attorney's office and entered into negotiations in which representatives of the American Seating Company participated. Here again Percy's version of the facts is in conflict with James',

but on August 9, 1932, Percy signed an agreement with the American Seating Company, James' principal creditor, wherein it was provided:

" 2. Adamson [*i. e.*, Percy] agrees to forthwith cause to be created and organized  *  *  *  a corporation, which shall be known as Adamson Bros. Company, Inc., or some name similar thereto  *  *  *. That immediately upon the organization of such corporation, *the copartnership of Adamson Bros. Co., consisting of [Percy] Adamson and James H. Adamson,* will sell to such corporation its business as a going concern with the good will thereof, and property and assets of every kind and description to which said copartnership now is or hereafter may be entitled  *  *  *  in consideration of the assumption by such corporation of all debts and liabilities of said copartnership, and the issuance and delivery to Adamson of all of the capital stock of said corporation.  Adamson agrees to thereupon deliver to American certificates evidencing twenty-five per cent (25%) of the total capital stock of said corporation so issued to him as collateral security for the payment of said demand promissory note for One Hundred Thousand Dollars ($100,000)."

The agreement also provided that Percy should buy for $25,000, to be paid in installments, a one-quarter interest in the note for $100,000 on which James was liable.  By a simultaneous agreement between James, Superior Seating Company, Inc., and American Seating Company, Inc., James was granted an option to acquire the remaining $75,000 interest in the note for an additional $25,000 and James likewise agreed to join with Percy in causing the corporation Adamson Bros. Company, Inc., to be organized.  The effect of these agreements was to require, in addition to the payment of $25,000, the deposit with the American Seating Company, Inc., as collateral for James' note of the equivalent of a twenty-five per cent interest in the partnership.  Percy paid to the American Seating Company, Inc., the first $25,000, which was charged to James' account on the partnership books, but subsequently refused to proceed with the incorporation of Adamson Bros. Company, Inc., and on September 16, 1932, wrote the attorney for the American Seating Company, Inc., to that effect.  It is significant, however, that the contract of August 9, 1932, constituted recognition by Percy that James had at least a twenty-five per cent interest in the partnership, since that interest was agreed to be deposited as collateral for James' note, and furthermore in that the $25,000 paid in reduction of the note was charged to James' account on the books of the partnership.  It is of equal significance that on March 24, 1934, Percy wrote to Seidman and Seidman, accountants for the American Seating Company, Inc., stating as a reason for his failure to proceed with the agreement previously entered into, as follows:

"In reply to your letter of the 19th inst., we beg to inform you that the Superior Seating Co., Inc., was never a partner in the firm of Adamson Bros. Company and *Mr. James H. Adamson's interest in the firm of Adamson Bros. Company was liquidated as at December 31, 1932.*

"We trust this is the information you require,
"Yours very truly,
"ADAMSON BROS. COMPANY
"P. ADAMSON."

In the light of the evidence which we have recapitulated, it cannot be maintained that there was only an ostensible or apparent partnership in which James had no rights as a partner and that all the documents were merely part of an arrangement whereby Percy was to be sole owner of the business, to which James furnished the capital and loaned the credit. In order to so hold it would be necessary to disregard the plain inference to be drawn from the documents and give them a meaning quite different from that which they express. It would also be necessary to disregard the several instances of simultaneous and equal drawings by James and Percy, drawings which are substantial in the aggregate and which demonstrate that both parties recognized the existence of the partnership and the equal rights of the partners. Nor can it be explained why, if James was not a partner, he should have received a substantial sum in excess of the amount advanced by him to the firm. It would likewise be necessary to disregard the accounts of James and Percy on the partnership books, disclosing credits in favor of each resulting from the operations of the partnership. So, too, would it be necessary to disregard the partnership income tax returns, the entry made by Peterson, the negotiations with the American Seating Company including the contract of August 9, 1932, and Percy's written claim that the partnership originally entered into had been dissolved and liquidated in 1932. From all these facts we cannot avoid the conclusion that the interest of James Adamson in the firm of Adamson Bros. Company was fully established and that the finding of the referee, confirmed by the court, that James and Percy were not partners is against the weight of the evidence.

The final question is whether, previous to the institution of these actions, James' interest in the partnership had been transferred to the Superior Seating Company, Inc. That question of fact was decided, we think correctly, against the Superior Seating Company, Inc., and in favor of James. James undoubtedly was ready to make the transfer, and executed the documents which would evidence the assignment of his interest in the partnership,

as a part of the plan to satisfy the American Seating Company, Inc., but the latter refused to accept them. The execution of the documents did not constitute a transfer in the absence of delivery and acceptance.

We do not pass upon the question now whether the inventions including "Lastex" are partnership property or the individual property of Percy Adamson. That question is reserved for determination on the accounting herein.

The judgment in so far as appealed from by appellant James H. Adamson, and the findings and conclusion with respect to the existence of the partnership alleged, should be reversed and new findings and conclusions made; the findings and conclusions with respect to the twelfth separate defense in the amended answer of Percy Adamson to the effect that James H. Adamson is not the real party in interest should be affirmed; and a new trial ordered to include the partnership accounting and a determination of the issues raised in the second action in so far as they were not tried in the first action.

MARTIN, P. J., McAVOY and COHN, JJ., concur; O'MALLEY, J., dissents in part.

O'MALLEY, J. (dissenting in part). I agree that the evidence required a finding that James H. Adamson had an interest in the partnership, but dissent in so far as it is held that such interest was not transferred to the Superior Seating Company, Inc.

Judgment in so far as appealed from by appellant James H. Adamson, and the findings and conclusions with respect to the existence of the partnership alleged, reversed; new findings and conclusions to be made in the order; the findings and conclusions with respect to the twelfth separate defense in the amended answer of Percy Adamson to the effect that James H. Adamson is not the real party in interest are affirmed; and a new trial ordered to include the partnership accounting and a determination of the issues raised in the second action in so far as they were not tried in the first action. Settle order on notice.